734 S.E.2d 148

Connie CARSON, as Personal Representative of
the Estate of Beryl Harvey, Appellant,

v.

CSX TRANSPORTATION, INC., Respondent.

No. 27186.

Supreme Court of South Carolina.

Heard Feb. 9, 2012.

Decided Nov. 7, 2012.

222

J. Christopher Wilson, of Wilson, Luginbill & Kirkland, of Bamberg; John E. Parker, R. Alexander Murdaugh, William F. Barnes III, and Matthew V. Creech, all of Peters, Murdaugh, Parker, Eltzroth & Detrick, of Hampton, for Appellant.

Elizabeth A. McLeod and Mark C. Wilby, both of Fulcher Hagler, of Augusta, Georgia; John C. Millberg, of Millberg Gordon & Stewart, of Raleigh, North Carolina, and Jonathan P. Harmon, of McGuire Woods, of Richmond, Virginia, for Respondent.

Chief Justice TOAL.

In this wrongful death and survival action involving a train collision, Connie Carson (Appellant), as personal representative of the estate of Beryl Harvey, argues the circuit court erroneously excluded certain evidence, charged the jury, and permitted an inconsistent verdict in the survival action. We affirm the circuit court's evidentiary determinations and jury charge, but reverse the circuit court's decision denying Appellant's request for a new trial *nisi additur* and remand the survival action for a new trial absolute.

### Facts/Procedural Background

On May 30, 2004, at approximately 7:05 p.m., Frances Harvey (Ms. Harvey) was driving her son, Beryl Harvey (Decedent), to go fishing when she approached a grade crossing on Honeyford Road in Denmark, South Carolina. The crossing did not have lights or a crossbar, but was marked with crossbucks, a stop sign, and white stop lines and railroad

markings on the pavement. Ms. Harvey testified that she stopped, looked left, turned and looked right, and slowly proceeded across the tracks after not seeing or hearing a train. She does not remember anything after proceeding forward. The engineer trainee who was operating the train testified that he noticed a tan van stop momentarily before pulling onto the crossing and stopping on the tracks. The train was travelling at approximately 46 miles per hour when it collided with Ms. Harvey's van. Decedent was a quadriplegic,[1] and was secured in his wheelchair in the rear of the van, facing the opposite direction of the oncoming train, when the van was hit by the train. Decedent was ejected from the van and was still alive when he landed in some briar and bushes near the train track. A witness to the scene testified he heard Decedent call out for his mother from the brush, and two other witnesses testified they heard Decedent moaning. Decedent died at the scene from blunt trauma to his head and chest.

Appellant filed a wrongful death action against both CSX and the South Carolina Department of Transportation (SCDOT) on February 21, 2006,[2] and then filed a survival action against both parties on May 25, 2006.[3] Appellant settled her claims against SCDOT prior to trial.

Appellant and CSX continued to trial before a jury. Central to Appellant's claim of negligence were the allegations that CSX failed to eliminate trees and vegetation that obstructed Ms. Harvey's view and that CSX failed to adequately sound its horn in compliance with South Carolina law and CSX's internal operating rules. Appellant offered evidence that at the time of the accident, the vegetation surrounding the Honeyford Road crossing did not accord with the specifications prescribed by CSX's internal crossing clearing program. CSX offered into evidence pictures of the scene, taken by an investigator working for the law firm representing

---

1. Decedent lost use of his legs and arms as a result of a diving accident at the age of 16.

2. Appellant filed amended complaints in the wrongful death and survival actions against both parties in August of 2008.

3. These actions were consolidated for trial.

Appellant days after the accident, which tended to show an unobstructed view of the tracks. CSX also offered the testimony of an eyewitness, who was stopped on the opposite side of the tracks as the train approached, that he could clearly see the train approaching.

Regarding the claim of an inadequate warning signal, Appellant argued that CSX was negligent per se for failing to comply with section 58–15–910 of the South Carolina Code, which mandates that a train begin to sound its whistle or horn at 1,500 feet from a road crossing and to continue whistling until the train crosses the intersection. S.C.Code Ann. § 58–15–910 (1976). Appellant additionally offered testimony regarding CSX's operating rule that the train horn must be sounded at the whistle post and be blown in two long blasts, followed by a short blast, followed by another long blast. The train that collided with Ms. Harvey's van was equipped with a data event recorder that revealed the train operator first sounded the horn at 1,347 feet from the crossing, and then blew the horn three additional times before striking Ms. Harvey's van. There was testimony that the duration of the horn blasts and the time between the horn blasts did not comply with CSX's operating rules. CSX offered the testimony of the eyewitness that the horn was very loud and that the engineer "sat down" on the horn as it approached the intersection and it did not stop until after the collision.

After seven days of trial before a jury, the jury returned a special verdict finding CSX forty percent negligent and Ms. Harvey sixty percent negligent. This fault allocation gave rise to a defense verdict on the Appellant's wrongful death claim. The jury found the damages in the survival action amounted to zero dollars. Appellant filed motions for judgment notwithstanding the verdict (JNOV), new trial absolute, and new trial *nisi additur*. The circuit court denied each of these motions. This action is before this Court pursuant to Rule 204(b), SCACR.

## ISSUES

I. Whether the circuit court properly excluded all evidence related to SCDOT's pre-accident recommendation to install gates and lights at the crossing.

**II.** Whether the circuit court properly excluded all evidence related to post-accident vegetation cutting by CSX.

**III.** Whether the circuit court properly omitted the "particularly dangerous" language from section 56–5–2715 of the South Carolina Code when charging the jury on a driver's duty to stop.

**IV.** Whether Appellant is entitled to a new trial absolute or a new trial *nisi additur* due to the jury's finding of zero dollars in damages in the survival action.

### STANDARD OF REVIEW

In an action at law, on appeal of a case tried by a jury, the jurisdiction of the appellate court extends merely to the correction of errors of law. *Erickson v. Jones St. Publishers, LLC,* 368 S.C. 444, 464, 629 S.E.2d 653, 663–64 (2006). The admission or exclusion of evidence, the decision of the circuit court as to particular jury instructions, and the denial of a motion for a new trial *nisi additur* are all actions within the sound discretion of the circuit court and will not be disturbed on appeal absent an abuse of discretion. *See Historic Charleston Holdings, LLC v. Mallon,* 381 S.C. 417, 434, 673 S.E.2d 448, 457 (2009) (admission of evidence); *Cole v. Raut,* 378 S.C. 398, 404, 663 S.E.2d 30, 33 (2008) (jury charge); *O'Neal v. Bowles,* 314 S.C. 525, 527, 431 S.E.2d 555, 556 (1993) (*nisi additur*). An abuse of discretion occurs when the conclusions of the circuit court are either controlled by an error of law or are based on unsupported factual conclusions. *Kiriakides v. Sch. Dist. of Greenville Cty.,* 382 S.C. 8, 20, 675 S.E.2d 439, 445 (2009).

### ANALYSIS

**I. Exclusion of Evidence Related to SCDOT's Pre–Accident Recommendation to Install Gates and Lights at the Crossing**

On April 26, 2004, roughly a month before the accident, a diagnostic team with SCDOT evaluated the Honeyford Road crossing for the purpose of securing federal funding pursuant to section 130 of Title 23 to the United States Code (section 130) and recommended that gates and lights be installed using those funds. 23 U.S.C. § 130 (Supp.2011). The circuit judge

excluded from evidence any reference to this recommendation on three grounds: it, was subject to the evidentiary privilege of section 409 of title 23 to the United States Code, 23 U.S.C. § 409 (Supp.2011) (section 409), it is a subsequent remedial measure and therefore not admissible under Rule 407, SCRE, and its prejudicial value outweighed its probative value and should be excluded under Rule 403, SCRE. Appellant argues the circuit court erred on each of these grounds. We disagree.

Appellant sought to call Darrell Munn, a research engineer on SCDOT's diagnostic team that evaluated the Honeyford Road crossing, to testify about his observations of the Honeyford Road crossing and the resulting recommendation by the diagnostic team to install flashing lights and a crossbar. CSX objected to Munn's testimony on the ground it was inadmissible pursuant to section 409. Section 409 provides:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds **shall not be subject to discovery or admitted into evidence in a Federal or State court** proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

23 U.S.C. § 409 (emphasis added). The circuit judge sustained the objection, finding that the admission of Munn's testimony was preempted by this federal law and additionally, that Munn's testimony should be excluded on Rule 407 and 403, SCRE, grounds.

Appellant first argues that data collected for purposes of securing federal money under section 130 is not subject to evidentiary exclusion under section 409 because the United States Supreme Court in *Pierce County Washington v. Guillen*, 537 U.S. 129, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003), held that section 409 only protects documents collected specifically

for 23 U.S.C. § 152 purposes.[4] While the Supreme Court can be quoted as saying such, Appellant misconstrues the holding of *Pierce County*. In that case, the Court was determining the scope of section 409 protection where data compiled for purposes of receiving federal money under 23 U.S.C. § 152 was at issue and where petitioner urged the Court to apply section 409 broadly to exclude data generated for purposes other than securing section 152 funds. *Pierce Cnty.*, 537 U.S. at 143, 123 S.Ct. 720. The Supreme Court in no way intended to read out section 409's reference to section 130, at issue in this case.

Appellant alternatively argues that Munn's testimony is not subject to section 409's evidentiary privilege because it protects only "reports, surveys, schedules, lists, or data compiled" during a safety planning evaluation and Munn's testimony about his observations and conclusions is not a document. We believe this hyper-technical reading of section 409 would render the statute meaningless.

The Supreme Court, in *Pierce County*, noted that the purpose of establishing the evidentiary privilege found in section 409 was to quell states' fears that "diligent efforts to identify roads eligible for aid under [federal highway safety programs] would increase the risk of liability for accidents that took place at hazardous locations before improvements could be made." 537 U.S. at 133, 123 S.Ct. 720. The Supreme Court declined to adopt the narrow reading of section 409 urged by respondents in that case, stating:

> that reading would render the 1995 amendment to § 409 (changing the language from "compiled" to "compiled *or collected*") an exercise in futility. We have said before that, "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." ... [Respondent's] reading gives the amendment no "real and substantial effect" and, accordingly, cannot be the proper understanding of the statute.

*Id.* at 145, 123 S.Ct. 720 (internal citations omitted). The approach taken by the Supreme Court does not allow us to adopt Appellant's argument that section 409 excludes the

---

4. In 2005, Congress replaced section 409's cross-reference to 23 U.S.C. § 152 with 23 U.S.C. § 148.

documents containing data collected for purposes of securing federal highway safety funds, but not the testimony of mental impressions made when collecting that data.

Appellant cites *Bowman v. Norfolk Southern Railway Company,* No. 94–1204, 1995 WL 550079 (4th Cir. Sept. 15, 1995), to support its contention that CSX failed to meet its burden for establishing the elements of section 409, discussed *supra.* Because this case more aptly supports Appellant's contention that Munn's testimony is admissible in the face of section 409, we discuss it here.

In *Bowman,* a South Carolina district court allowed a highway department official who had conducted a routine safety inspection of the railroad crossing at issue to testify about his findings, even though his written report was ruled inadmissible by the district court under section 409. *Id.* at *6. In evaluating the propriety of the district court's admission of the officer's testimony, the United States Court of Appeals for the Fourth Circuit recognized the general proposition that "witnesses should not be allowed to circumvent § 409 by testifying regarding the contents of an inadmissible report." *Id.* The Fourth Circuit noted that it reviews the court's admission of the testimony under an abuse of discretion standard, and then affirmed the admission upon the belief that the highway department official "simply used portions of the document to refresh his recollection about matters otherwise available to any lay witness who had observed the scene." *Id.*

We believe the Fourth Circuit intended *Bowman,* an unpublished opinion, to be a narrow holding. The bulk of national jurisprudence on this issue supports the circuit court's decision in this case to exclude Munn's testimony under the ambit of section 409. *See Harrison v. Burlington N. R.R. Co.,* 965 F.2d 155, 160 (7th Cir.1992) (upholding the district court's exclusion of the testimony by the author of an excluded report because allowing that testimony would circumvent the purposes of the statute); *Powers v. CSX Transp., Inc.,* 177 F.Supp.2d 1276, 1279–80 (S.D.Ala.2001) ("It is well-settled that a plaintiff may not circumvent Section 409 by asking a witness to testify to matters the witness learned from documents protected by Section 409."); *Rodenbeck v. Norfolk & Western Ry. Co.,* 982 F.Supp. 620, 623 (N.D.Ind.1997) (" § 409 encompasses not only grade crossing safety enhancement docu-

ments, but also any testimony about those documents."). Recognizing the policy underlying section 409, we find that any testimony about observations made while gathering data for purposes of securing the federal highway safety funds referenced in section 409 falls within the evidentiary privilege of section 409.

Alternatively, Appellant contends that CSX did not satisfy its burden to establish that the data compiled during the diagnostic team's site visit was for purpose of securing federal money under section 130. We disagree. Prior to trial, CSX filed a motion in limine arguing that any testimony regarding the recommendation to install gates and lights was inadmissible under section 409. CSX supported that argument with the deposition testimony of Munn that in making the site visit, the team followed the criteria set forth in federal regulations for purposes of receiving section 130 funds. Upon this showing, the judge invoked the evidentiary privilege of section 409 to exclude Munn's testimony. We believe CSX satisfied its burden by showing that SCDOT's diagnostic team made the April 26, 2004 site visit to evaluate its safety so that it could apply for federal funds under section 130. Therefore, we find the circuit court properly excluded Munn's testimony pursuant to section 409.

Appellant finally argues the circuit judge erred in excluding evidence of SCDOT's recommendation to install gates and lights on Rule 403 and 407, SCRE, grounds. Because we find the circuit judge properly excluded this evidence under section 409, we do not reach those issues. *See Wilkinson ex rel. Wilkinson v. Palmetto State Transp. Co.*, 382 S.C. 295, 307, 676 S.E.2d 700, 706 (2009) (appellate court need not discuss remaining issues when determination of prior issue is dispositive).

## II. Exclusion of Evidence Related to Post–Accident Vegetation Cutting

At trial, Appellant provided evidence that the vegetation bordering the tracks was not cut according to the specifications of CSX's internal crossing clearing program. CSX cut the vegetation according to this standard shortly after the accident, on July 19, 2004. The circuit judge's uniform di-

rective throughout the trial was to exclude any evidence of subsequent remedial measures on Rule 403 and Rule 407, SCRE, grounds. Rule 407 of the South Carolina Rules of Evidence provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Rule 407, SCRE.

The rationale underlying Rule 407 "rests on a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." Fed.R.Evid. 407 advisory committee's note.[5] In *Webb v. CSX Transportation, Inc.*, 364 S.C. 639, 653, 615 S.E.2d 440, 448 (2005), this Court reversed and remanded a train collision case, in part, because of the erroneous admission of evidence of post-accident vegetation cutting. The *Webb* court rejected the narrow application of Rule 407 used in *Reiland v. Southland Equipment Service, Inc.*, 330 S.C. 617, 500 S.E.2d 145 (Ct.App.1998), and held, "Rule 407 bars the introduction of any change, repair, or precaution that under the plaintiff's theory would have made the accident less likely to happen, unless the evidence is offered for another purpose." *Webb*, 364 S.C. at 653, 615 S.E.2d at 448.

Appellant argues the circuit judge should have recognized the impeachment exception to Rule 407 to admit the evidence of subsequent remedial measures, and additionally argues that CSX waived its right to object to the admission of Exhibit 134. We disagree.

### A. *Impeachment of CSX's Position that the Sight Distance was Adequate*

■ Appellant contends she should have been permitted to introduce evidence of post-accident cutting to impeach CSX's

---

5. Although there are minor differences between Rule 407 of the Federal Rules of Evidence and Rule 407, SCRE, the underlying policy of each is the same.

position that the available sight distance on May 30, 2004, was adequate and that the vegetation did not need to be cut. We disagree. Allowing a party to invoke the impeachment exception to Rule 407 in response to the opposing party's general defense against a negligence claim would swallow the rule. The Supreme Court of Illinois encountered a party propounding this same logic and stated:

> Just as evidence of subsequent remedial measures is not considered sufficiently probative to be admissible to prove prior negligence, that evidence is not admissible for impeachment where the sole value of the impeachment rests on that same impermissible inference of prior negligence.

*Herzog v. Lexington Twp.*, 167 Ill.2d 288, 212 Ill.Dec. 581, 657 N.E.2d 926, 933 (1995). Accordingly, it was not an abuse of discretion to exclude a photograph that depicted CSX's post-accident clearing of the vegetation along the Honeyford Road crossing simply because CSX maintained that the sight distance at the time of the accident was adequate.

### B. Impeachment of Jack Cowan's Testimony

■ Along similar lines, Appellant contends evidence of post-accident vegetation clearing should have been admitted to impeach the testimony of Jack Cowan, a CSX engineer, that CSX has always cut the vegetation at its crossings, even prior to CSX's implementation of the crossing clearing program in 2001. Appellant sought to admit a photograph of the crossing taken after the vegetation was cleared according to CSX's updated policy to allow the jury to compare it to the photograph of the crossing taken days after the accident.

During cross-examination of Cowan, Appellant asked whether Cowan would be able to see a car approaching if vegetation had grown up around the crossing, to which Cowan replied that he had not encountered this problem since, in his forty year career with CSX, CSX always kept vegetation cut back. Cowan admitted that the way CSX cleared crossings had changed over the years, but that CSX had always implemented a program of cutting back vegetation at crossings.

CSX's general defense theory was that although the vegetation had not yet been cut in accord with the latest internal policies, the sight distance at the crossing was nevertheless

adequate to allow a driver sufficient opportunity to see an approaching train. Cowan's testimony was consistent with this theory of defense. Additionally, CSX conceded that the vegetation was not cut in accord with its own policies. Evidence of subsequent remedial measures could not have impeached this concession. Appellant could have properly used this photograph as impeachment if, for example, Cowan had testified that at the time of the accident, the vegetation surrounding the crossing was cleared in accordance with CSX's internal policies. However, upon these facts, the photograph depicting post-accident vegetation clearing had no impeachment value, and therefore was properly excluded under Rule 407, SCRE.

### C. Animation Expert's Handwritten Notes

On appeal, much has been made of the circuit judge's ruling that prohibited Appellant from referencing a portion of Gary Huett's notes during closing arguments—an exhibit introduced into evidence by CSX. After a thorough reading of the Record and due consideration, we uphold the circuit judge's determination to exclude reference to the portion of the notes not used at trial because these notes were not critical to refuting the negative cross-examination and arguments made by CSX's counsel. Additionally, reference to this portion of the notes would have undermined, at the eleventh hour of trial, the circuit judge's consistent goal of excluding evidence of post-accident cutting.

CSX's Exhibit 134 originally consisted of five pages of handwritten notes that Appellant's expert, Gary Huett, took for purposes of creating an accident animation. Because the vegetation along the tracks was cut shortly after the accident, Huett relied, in part, on photogrammetry[6] to re-enact the accident scene, using photographs taken by Appellant's investigator, Donald Crews, days after the accident occurred. Exhibit 134 was introduced into evidence without objection. However, the exhibit was not seen by or published to the jury. The first page of Huett's notes stated,

---

6. Photogrammetry is the process used to determine the geometric properties of an object from two-dimensional photographs based on height and elevation of other known points.

"DOA [date of accident]: ... May 30, 2004
Survey 2006
Cut back since accident
Poor quality photos after accident

A central issue at trial was a determination of the sight distance Ms. Harvey would have had at the point where she stopped behind the tracks. During CSX's cross-examination of Huett and another expert, Dr. Heathington, counsel made reference to the fourth page of Huett's notes that stated, "Performed my photogrammetric analysis ..., then compared it to Don Crews' measurements at site. They lined up very well. His 1014' [feet] visib[ility] @ 70' [inches] past stop bar is consistent." CSX read this portion of the notes into evidence to refute the experts' claims that the sight distance may have been much less.

A key defense strategy of CSX was to undermine the reliability of the animation created by Huett. At closing argument, Appellant sought to refute several of CSX's attacks on the animation by stating that it was only necessary to create the animation because the vegetation along the sight line of the tracks had since been cut. Specifically, Appellant sought to introduce the first page of Huett's notes that made reference to the post-accident cutting. During closing argument, Appellant's counsel stated, "One thing I want to talk with you about is there was a lot of criticism of our deceptive animation. We had to do the animation.... This is Defendant's Exhibit 134." CSX promptly objected. In arguing against that objection, Appellant's counsel stated, "we wanted to use Exhibit 134 to show that, in fact, he had to do an animation to get the distances because they had cut the crossing." [7]

The circuit judge sustained CSX's objection, stating:

... We have ruled consistently through the trial that any subsequent—whether it's remedial or whatever it was—any subsequent cutting of the trees I was keeping out. I found it not to be relevant. I found it to violate 407 and 403, and

---

7. We note that even in the absence of post-accident clearing, it is common practice in train collision cases to create an animated re-enactment.

when it was brought to our attention at the side bar during argument that document or exhibit in its entirety would have violated my prior rulings and that's the reason I precluded argument on it at the time. You're protected, Mr. Parker.

Appellant argues that CSX (1) waived its right to object to the use of Exhibit 134 when it introduced it into evidence, and (2) "opened the door" to reference of the full exhibit because it criticized Huett's animation as being inaccurate. Therefore, Appellant argues that reference to Huett's notes was necessary to explain that post-accident cutting necessitated Huett's reliance on photogrammetry. We disagree.

 Over the course of this long and complex trial, the circuit judge was careful to exclude any reference to subsequent remedial measures, pursuant to Rules 403 and 407, SCRE.[8] It is clear from the circuit judge's response to CSX's objection that the admission of this portion of Huett's notes would have undermined this consistent directive at the final hour of trial. Appellant argues that CSX's failure "to make an objection at the time evidence is offered constitutes waiver of the right to object." *Cogdill v. Watson*, 289 S.C. 531, 538, 347 S.E.2d 126, 129 (Ct.App.1986). However, as we view the Record, it is unclear whether the entirety of Huett's notes was placed into evidence. Moreover, even if we assumed it was, a court always has discretion to exclude evidence *sua sponte* if it believes it will mislead a jury or is unduly prejudicial. *See Carolina Home Builders, Inc. v. Armstrong Furnace Co.*, 259 S.C. 346, 357, 191 S.E.2d 774, 779 (1972) ("A motion to strike evidence admitted without objection is addressed to the sound discretion of the court."). In this instance, had CSX not objected to the admission of evidence of post-accident cutting, it is clear, based on the circuit judge's adamant directive to exclude such evidence, that he would have prohibited Appellant from bringing the evidence in through the back door. Therefore, we find that the circuit judge did not abuse his

---

8. For example, when Huett mentioned on the stand that some problematic bushes were no longer there, the circuit judge dismissed the jury and warned, "All right. Mr. Huett, we have gone to great lengths to try this case based solely on how this crossing scene appeared on the day in question. . . . Please do not make any additional references to what was not there in your analysis."

discretion in prohibiting Appellant from referencing the page of Huett's notes that disclosed the exact evidence he had consistently excluded at trial.

Further, we do not believe it was necessary to reveal information about the post-accident cutting to refute CSX's negative remarks about Huett's animation. As a defense strategy, CSX attempted to undermine the reliability of Huett's animation in several ways. During cross-examination, CSX questioned Huett about the animation's portrayal of the outside lighting, which looked "muddy," and the dimness of the train's headlight. CSX also opined that because of the skewed angle at which the train was approaching, it was unnecessary for Ms. Harvey to turn her head to the left a full 45 degrees to see the train because her peripheral vision should have alerted her of the approaching train at 549 feet when the animation depicted her looking straight ahead. CSX additionally questioned why the animation did not provide the sound of the horn blowing, especially during the extended period when the animation depicted a view of the opposite side of the tracks from which the train was approaching.[9] Also during cross-examination, and again at closing argument, CSX raised questions about the animation's depiction of Ms. Harvey's stop point and the time the animation devoted to her stopping and looking left, right, and then proceeding forward (20 seconds). Finally, CSX questioned why the animation did not allow a viewer to see when exactly the train came into view, but rather focused on the other side of the tracks at the time when the train should have become apparent. In sum, CSX's attacks focused on the animation's portrayal of the outside lighting, its lack of sound, the duration that the van stopped, the camera angle of the tracks as the train approached, and the manner in which it portrayed Ms. Harvey turning her head. Notably, CSX did not question Huett's use of photogrammetry or the accuracy of Huett's depiction of the vegetation bordering the tracks. Therefore, it was not necessary to reveal evidence of post-accident cutting to the jury to refute the assertions made by CSX's counsel. Accordingly, we

9. Appellant has not provided her animation as an exhibit, and therefore our ability to understand the reliability claims made by CSX is limited to the words exchanged at trial.

find the circuit judge did not abuse his discretion in sustaining CSX's motion to limit reference to Huett's notes.

### III. Jury Charge

Appellant next argues that the circuit judge committed reversible error by excluding the term "particularly dangerous highway crossing" when charging the jury on the statute that establishes a driver's duty to stop at railway crossings. We disagree.

Section 56–5–2715 of the South Carolina Code reads:

The Department of Transportation ... *may designate particularly dangerous highway grade crossings of railroads and erect stop sign thereat.* When such signs are erected, the driver of any vehicle shall stop within fifty feet, but not less than fifteen feet, from the nearest rail of the railroad and shall proceed only upon exercising due care.

S.C.Code Ann. § 56–5–2715 (2006). In explaining Ms. Harvey's duty to stop under section 56–5–2715, the circuit judge omitted any reference to the emphasized language above. Although the colloquy during the charge conference does not elucidate the circuit judge's reasoning for striking that language, it appears the judge was merely searching for a statute that outlined the duty of drivers to stop at railway crossings, and the reference to a particularly dangerous railway crossing may have unnecessarily misled the jury into believing the Honeyford Road crossing was affirmatively designated as a particularly dangerous crossing.

We believe it was within the circuit judge's discretion to omit this particular statutory language because of its perceived irrelevance to the issue of CSX's negligence and because of the risk of confusing or misleading the jury. Therefore, we uphold the circuit judge's charge on section 56–5–2715.

### IV. Survival Action Damages

Finally, Appellant argues she is entitled to a new trial absolute or a new trial *nisi additur* on the survival action because the circuit judge's jury charge led the jury to believe Ms. Harvey's negligence in the wrongful death action should be imputed to survival action damages. Therefore, Appellant

claims, the circuit judge erred in denying Appellant's post-trial motions for JNOV, new trial absolute, or new trial *nisi additur*. We find that the jury's failure to award damages in the survival action was inconsistent with its liability allocation and demonstrated a lack of understanding or confusion among the jurors. Therefore, we reverse the circuit court's denial of Appellant's motion for a new trial *nisi additur* and remand the survival action for a new trial absolute with respect to liability and damages.[10]

This Court recognizes an abuse of discretion standard for reviewing a circuit court's decision to deny a new trial *nisi additur*. *O'Neal v. Bowles*, 314 S.C. 525, 526–27, 431 S.E.2d 555, 556 (1993). It is within a trial judge's province to grant a new trial *nisi* if he finds the amount of the verdict to be merely inadequate or excessive. *Bailey v. Peacock*, 318 S.C. 13, 14, 455 S.E.2d 690, 691 (1995). In reviewing the trial court's decision regarding a new trial *nisi*, "[t]his Court has the duty to review the record and determine whether there has been an abuse of discretion amounting to an error of law." *Id.* "If the amount of the verdict is *grossly* inadequate or excessive so as to be the result of passion, caprice, prejudice, or some other influence outside the evidence, the trial judge must grant a new trial absolute." *O'Neal*, 314 S.C. at 527, 431 S.E.2d at 556 (citations omitted) (emphasis in original). Thus, "on appeal of the denial of a motion for a new trial *nisi*, this Court will reverse when the verdict is grossly inadequate or excessive requiring the granting of a new trial absolute." *Id.*

The evidence presented at trial established that Decedent experienced conscious pain and suffering before he died. A driver who witnessed the collision stated he saw Decedent lying in the brush and "[h]e looked like he was in a knot," and that "[h]e was hollering Mama[.]" Another witness to the scene stated that Decedent was thrown into some shallow bushes and she "could hear him you know groaning, moaning,

---

10. We note that section 15–33–125 of the South Carolina prohibits this Court from directing a new trial on damages under these circumstances. *See* S.C.Code Ann. § 15–35–125 (Supp.2011) ("Unless the plaintiff is entitled to a directed verdict on the issue of liability, any new trial must include both issues of liability and damages."); *Stokes v. Denmark Emerg. Med. Servs.*, 315 S.C. 263, 433 S.E.2d 850 (1993) (upholding the constitutionality of section 15–33–125).

pain, of course. . . ." A volunteer fireman who responded to the accident testified, "He was moaning and then I started—I heard him start gurgling some. I could tell he was in a lot of pain."

While charging the jury, the circuit judge initially stated that if the jury found Ms. Harvey to be more than fifty percent negligent, "that would be the end of it." Appellant objected and after some back and forth about whether Decedent's father's share of survival damages abated at his death (in the presence of the jury), the circuit judge amended the verdict form to instruct the jury to "[m]ake no adjustment for the percentage of negligence assigned to Defendant or Frances Harvey." Still, the jury appeared to be unclear about the effect of finding Ms. Harvey's negligence to be greater than CSX's. During deliberation, the jury sent in the question, "If we answer yes to number six [Ms. Harvey's negligence being greater than fifty percent], do we have to award any amount on number eight? Number eight being, of course, conscious pain—survival action." The circuit judge answered, "The answer is, yes, if you find [Decedent] suffered conscious pain and suffering, no, if you find that [Decedent] did not suffer any conscious pain and suffering." Although the jury found CSX to be forty percent negligent in causing the accident, the jury found the damages for conscious pain and suffering and funeral expenses amounted to zero dollars. It is evident to us that the jury was confused in rendering its damages award. Aside from Appellant's clear showing at trial that Decedent experienced conscious pain and suffering before his death, Appellant presented funeral and burial receipts representing expenses in excess of $7,000. Therefore, the award of zero dollars in damages was not "merely inadequate," but was legally incorrect.

In South Carolina, a survival action is governed by statute. S.C.Code Ann. § 15–5–90 (1995). Unlike damages in a wrongful death action, which are for the benefit of the decedent's family, damages in a survival action are for the benefit of the decedent's estate. F. Patrick Hubbard & Robert L. Felix, *The South Carolina Law of Torts* 706 (4th ed.2011). Thus, a survival claim may only be filed by the personal representative of the decedent's estate. *Id.* Accordingly, the personal representative stands in the shoes of the decedent, and may bring

any cause of action the decedent could have brought in his life. *Id.* at 705. Therefore, in determining survival action damages, a court or jury should only consider the entitlement of the estate, not the identification of its beneficiaries. Accordingly, we note that Ms. Harvey's status as a beneficiary cannot be used to impute her comparative negligence to the estate.

## CONCLUSION

For the foregoing reasons, we affirm the circuit court's exclusion of evidence and its jury charge, but reverse the denial of Appellant's motion for new trial *nisi additur* on the survival action, and remand for a new trial absolute in the survival action.

BEATTY, KITTREDGE and HEARN, JJ., concur.

PLEICONES, J., concurring in a separate opinion.

Justice PLEICONES, concurring.

I concur but write separately to express my different view on several issues.

First, I agree that we may not reverse the trial court's ruling that witness Munn could not be called to testify to the SCDOT's April 2004 recommendation that active traffic devices be installed at the Honeyford Road Crossing because such testimony is barred by 23 U.S.C. § 409 (Supp.2011). As I read the record, appellant called Munn solely to have him testify that "On April 24, a month prior to this collision, that SCDOT did an evaluation [and] recommended that gates and lights be installed at the crossing."

The majority holds, however, not only that the SCDOT team's recommendation was properly excluded, but also that Munn could not "testify about his observations of the Honeyford Road Crossing...." In my opinion, no issue regarding Munn's ability to testify to his observations is properly before the Court as appellant never sought to elicit this type of evidence from Munn at trial. It is well-settled that an appellant cannot change or add to the arguments he made at trial on appeal. *E.g., Morris v. Anderson County,* 349 S.C. 607, 564 S.E.2d 649 (2002). Had appellant in fact called Munn to

testify to his observations, I would find the trial judge's denial of that request to be reversible error.

In my opinion, nothing in either 23 U.S.C. § 409 or *Pierce County Washington v. Guillen,* 537 U.S. 129, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003), prohibits an individual who compiled or collected data or who participated in the creation of "reports, surveys, schedules, or lists" for the purposes identified in § 409 from testifying as a fact witness. I agree that testimony of the contents of such reports, surveys, schedules, lists, compilations, or collections or the admission into evidence of these documents is prohibited. In *Bowman v. Norfolk Southern Railway Co.,* 1995 WL 550079 (4th Cir. Sept. 15, 1995), the official who had inspected the railroad crossing and produced a § 409 report was allowed to testify as a "lay witness" who had observed the scene, even being permitted to refresh his recollection by reference to the report. In *Harrison v. Burlington Northern R. Co.,* 965 F.2d 155 (7th Cir. 1992), the actual investigative report and recommendations were excluded, as were witnesses called to testify to the contents of these documents. In *Powers v. CSX Transp., Inc.,* 177 F.Supp.2d 1276 (S.D.Ala.2001), the court specifically stated, "It is well settled that a plaintiff may not circumvent Section 409 by asking a witness to testify to matters the witness learned from documents protected by Section 409 . . . on the other hand, knowledge gained by the witness independently of material protected by Section 409 is not protected. *E.g., Rodenbeck v. Norfolk & Western Railway Co.,* 982 F.Supp. 620, 625 (N.D.Ind.1997); *Palacios v. Louisiana & Delta Railroad Inc.,* 740 So.2d 95, 102 (La.1999)." *Id.* at 1280. In short, I am unable to identify any authority for the proposition that § 409 prevents an individual from testifying as a fact witness to his observations. Were this issue before us, I would find reversible error in this ruling.

As I read the record, it is clear that Exhibit 134 was admitted into evidence without objection. Insofar as I am aware, an attorney is permitted to argue the evidence and its inferences in her closing argument, but I agree with the majority that appellant did not show prejudice from this error. *See, e.g., O'Leary–Payne v. R.R. Hilton Head, II, Inc.,* 371 S.C. 340, 638 S.E.2d 96 (Ct.App.2006).

Further, I would find no error in the trial judge's redaction of § 56–5–2715 in his charge. Whether CSX was negligent in maintaining the sight lines at the Honeyford Road Crossing is independent of the DOT's determination of the type of warning signal to be used at the crossing. *Compare, e.g., Doremus v. Atlantic Coast Line R. Co.*, 242 S.C. 123, 130 S.E.2d 370 (1963) (common law duty of railroads to give such signals as may be reasonably necessary is independent of statutorily required signals). Like the majority, I find no error in this statutory charge. *E.g., Berberich v. Jack*, 392 S.C. 278, 709 S.E.2d 607 (2011) (reversible error to give confusing jury instructions).

Finally, while it is unnecessary to address appellant's contention that the trial court erred in denying her request for a new trial *nisi additur* or new trial absolute in the survival action in light of the holding that the confusing survival damages jury instruction mandates reversal, I would take this opportunity to remind the bench and bar that there is no procedure whereby an appellate court can order a *nisi* as a remedy. This is so since the denial of a *nisi* motion is a matter wholly within the trial court's discretion, and its ruling is not subject to appellate review. *E.g., Zorn v. Crawford*, 252 S.C. 127, 165 S.E.2d 640 (1969). Where a *nisi* has been denied, the only new trial relief an appellate court may grant is a new trial absolute, and then only if it finds the jury's verdict is either grossly inadequate or so excessive as to indicate passion, prejudice, or caprice. *Id.; see also O'Neal v. Bowles*, 314 S.C. 525, 431 S.E.2d 555 (1993).

For the reasons given above, I concur with the majority's decision to affirm the wrongful death appeal and reverse and remand the survival appeal for a new trial.